**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 8/19/13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  11-cr-22-01-JD
         v.                     *  February 12, 2013
                                *  2:10 p.m.
JOSE REYES                      *
                                *
* * * * * * * * * * * * * * * * *



TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE JOSEPH A. DICLERICO, JR.




Appearances:

For the Government:    Donald Feith, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301


For the Defendant:     Paul J. Garrity, Esq.
                       14 Londonderry Road
                       Londonderry, NH 03053


Probation Officer:     Jodi Gauvin

Interpreter:           Jean Pepper

Court Reporter:        Diane M. Churas, LCR, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1442

1                    BEFORE THE COURT

2              (Interpreter duly sworn.)

3              THE CLERK:  Court has before it for

4    consideration this afternoon sentencing in Criminal Case

5    11-22-01-JD, United States of America versus Jose Reyes.

6              THE COURT:  All right.  Good afternoon.

7              ALL:  Good afternoon, your Honor.

8              THE COURT:  At the last hearing we discussed

9    several procedural matters, and one of the issues that

10   we took up involved filing an amendment to the June 8,

11   2012, plea agreement in order to clarify the penalties

12   for the offenses to which Mr. Reyes has pled guilty to

13   be sure that he understood the consequences since there

14   was some concern and some uncertainty about the

15   penalties as stated in the original plea agreement.

16             The Court now has before it an amendment to

17   the June 8th plea agreement, and that amendment has been

18   signed by Assistant United States Attorney Donald Feith,

19   by the defendant, Jose Reyes, his attorney, Paul

20   Garrity, and the interpreter, Jean Pepper.

21             Now, Mr. Reyes, the Court has this document

22   before it, the amendment, and your signature appears on

23   page two.  Did you sign this amendment?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  And did you review it with Mr.

1   Garrity before you signed it?

2              THE DEFENDANT:  Yes.

3              THE COURT:  And you had the benefit of an

4   interpreter when you reviewed it?

5              THE DEFENDANT:  Yes.

6              THE COURT:  And did you sign it willingly and

7   voluntarily?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Now, this amendment states that if

10  the Court finds that you are liable or responsible for

11  less than 500 grams of cocaine, you could be subject to

12  a maximum term of imprisonment of 20 years.  Do you

13  understand that?

14             THE DEFENDANT:  Yes.

15             THE COURT:  And a maximum fine of a million

16  dollars.  Do you understand that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And a term of supervised release

19  of not less than three years and it could be as much as

20  life.  Do you understand that?

21             THE INTERPRETER:  I'm sorry, your Honor, could

22  you repeat the last sentence.

23             THE COURT:  A term of supervised release of

24  not less than three years and it could be for as much as

25  life.

1                THE DEFENDANT:  Yes.

2                THE COURT:  Now, as the agreement says, if the

3    Court should find that you were responsible for

4    500 grams or more of cocaine, then there is a mandatory

5    minimum sentence of five years.  Do you understand that?

6                THE DEFENDANT:  Yes.

7                THE COURT:  What that means is that the Court

8    would be required to impose a sentence of at least five

9    years.  Do you understand that?

10               THE DEFENDANT:  Yes.

11               THE COURT:  And the maximum in those

12   circumstances would be 20 years.  Do you understand

13   that?

14               THE DEFENDANT:  Yes, sir.

15               THE COURT:  There is also a maximum fine of a

16   million dollars and a term of supervised release of from

17   four years to life.  Do you understand that?

18               THE DEFENDANT:  Yes.

19               THE COURT:  Did anybody in any way force you

20   or threaten you into signing this amendment to the plea

21   agreement?

22               THE DEFENDANT:  No.

23               THE COURT:  The Court finds that Mr. Reyes has

24   knowingly, voluntarily, and intelligently executed this

25   amendment to the June 8, 2012, plea agreement and is

1    aware of the penalties that apply to this case depending

2    on the determination that the Court makes with respect

3    to drug quantities.

4              The Court has before it a Presentence

5    Investigation Report.  Have you reviewed that with your

6    client, Mr. Garrity?

7              MR. GARRITY:  I have, your Honor.

8              THE COURT:  Are there any exceptions or

9    objections you would like to take up?

10             MR. GARRITY:  Yes, your Honor.  In particular,

11   we object to the drug quantities contained in the

12   presentence report other than what was admitted to by

13   Mr. Reyes when he entered into this plea and what's

14   outlined in the plea agreement.  And just so the Court's

15   aware as to the basis for our objection to those parts

16   of the report, they are outlined primarily in paragraph

17   15 where there's talk of CI No. 3 and CI No. 4.  CI No.

18   3, I believe it's Carvajal.  He's an individual who

19   informed the government that he met Mr. Reyes in 2005

20   when he was involved in drug dealing with Mr. Reyes from

21   2005 until 2007, which I think the government agrees is

22   factually impossible since Mr. Reyes was incarcerated up

23   until November of 2006.

24             THE COURT:  Now, that was in the original.

25             MR. GARRITY:  It's still in mine, Judge, at

1    paragraph --

2              THE COURT:  You said 15 on page six.  Are we

3    on the same paragraph and page?

4              MR. GARRITY:  Paragraph 15, yes, your Honor.

5              THE COURT:  And how far into it?

6              MR. GARRITY:  We object to the entirety of

7    what's contained there because it appears to be based on

8    what CI No. 3 related to the government, who was

9    Carvajal.

10             THE COURT:  All right.  He was the one that

11   had given the prior information that was inaccurate --

12             MR. GARRITY:  Right.

13             THE COURT:  -- when Mr. Reyes was

14   incarcerated.

15             MR. GARRITY:  Right.

16             THE COURT:  And so you're really attacking his

17   credibility.

18             MR. GARRITY:  Yes, your Honor.  And there's

19   some other reasons to doubt his credibility, but that's

20   one of the key reasons.

21             We'd also object to what's outlined in

22   paragraph 16.  And there's talk of CI No. 4.  Again, we

23   question the credibility of CI No. 4.  If my

24   recollection is correct, CI No. 4 may be Nicole Wells

25   who also informed the government that she met with --

1   was dealing with Mr. Reyes and was romantically involved

2   with him beginning in 2005 and continued to do that for

3   about a year and a half until they allegedly broke up in

4   2007 when she became pregnant.  Again, factually

5   impossible given his incarceration status.  And there's

6   some additional reasons to doubt her credibility given

7   the Giglio material I received.

8           CI No. 5.  And if my recollection is correct,

9   that maybe Kelly Guay.  Again, we'd argue that her

10  credibility is substantially questioned given the Giglio

11  material I received, and in addition she was shown a

12  photo of Mr. Reyes during a proffer and could not

13  identify the photo of -- as Tony, the individual she

14  claimed she was dealing with, even though the photo was

15  that of Mr. Reyes.  So we object to any of the weights

16  outlined there.

17          In addition, Judge, we have a general argument

18  that where these persons' credibility is really at

19  issue -- and I know the standard of proof here is

20  preponderance of the evidence, nevertheless it still has

21  to be deemed reliable, and absent putting forward these

22  witnesses so that you can evaluate their credibility and

23  put them through cross-examination, what's outlined in a

24  report based on these individuals' allegations shouldn't

25  be utilized.

1          And one further thing, too, Judge.  It's

2    really not, I guess, an objection, but maybe a

3    clarification.  In paragraph 18 there's reference right

4    at the end where the report says:  Also worthy of note

5    is that two of Reyes's associates, Carvajal and Perez,

6    were convicted in state court.  Those were Peter and

7    Johnny, two of the co-workers, along with Mr. Reyes.

8    They were sentenced to 12 months imprisonment.  In

9    actuality, Judge, they were sentenced to -- I went to

10   the state court and got the sentencing documents.  Angel

11   Perez, who I believe is Johnny, he received 12 months in

12   the house of corrections, all but 49 days suspended.  So

13   he got 49 days.  And Peter received 12 months, all but

14   70 days suspended.

15          I just want to make sure that's correct,

16   Judge.  (Pause.)

17          Looks like he got 12 months, all but 70 days

18   suspended.  And, Judge, we'd also object to the

19   probation officer's conclusion in the report that Mr.

20   Reyes should be given an enhancement for being a manager

21   or supervisor.  We would argue to the Court that he,

22   Peter, and Johnny were co-workers in this organization

23   and there shouldn't be such enhancement.

24          THE COURT:  Mr. Feith, do I understand the

25   government doesn't object to the last point?

1          MR. FEITH:  Yes, it doesn't, your Honor;

2   that's correct.

3          THE COURT:  So that two-point adjustment will

4   be struck then in paragraph 29 which will result in a

5   new figure, 31, adjusted offense level of 26 at this

6   point in time.  All right.

7          MR. FEITH:  Your Honor, with respect to the

8   drug quantity, the United States in its sentencing

9   memorandum offered two methods of determining what it

10   asserted were reasonable methods for asserting or

11   determining what the drug quantity was.

12          Mr. Reyes admitted to being involved in a drug

13   conspiracy that spanned at least a period from

14   January 1st, 2007, through April 28th of 2008.  And

15   during the period -- your Honor, on page five of the

16   government's sentencing memorandum I reference the

17   period as January 1st, 2008, through April 2008.  That's

18   supposed to be January 1st, 2007.

19          But during the period of controlled buys as

20   set forth in the sentencing memorandum, Mr. Reyes sold

21   approximately 24 grams over a 24-day period.  So the

22   first method the United States offers is if the Court

23   were to take an average of one gram per day for the

24   848 days of the conspiracy, that would result in

25   848 grams, well over 500.  And the government submits

1    that that's an extremely conservative method of

2    calculating it because it only relies on the purchases

3    made by the individual identified as Confidential

4    Informant 2.  So it doesn't rely on the other

5    confidential informants at all.  And Confidential

6    Informant 2 is the confidential informant who made the

7    controlled buys.

8            Now, admittedly Confidential Informant 2 told

9    law enforcement that it was involved with Mr. Reyes for

10   approximately six months, but I think it is still fair

11   to extrapolate based upon that particular confidential

12   informant's purchases during the controlled buy period.

13           The other method that the United States offers

14   as an alternative or in combination is there was a sum

15   of money seized, $24,880, and if you take the purchase

16   price used in the controlled buys, 24.26 grams were

17   purchased for $1,700 in official funds.  That yields a

18   per gram price of $70.07.  If you take the $24,880

19   figure and divide it by $70.07, that yields 355.07

20   grams, plus a quantity of 27 grams that were seized at

21   the time the money was seized, and that gives you

22   382.67 grams.

23           And, your Honor, that is not 500 grams, but it

24   is 118 grams short of 500 with a significant period of

25   time in which you would have to conclude Mr. Reyes did

1   no drug deal in order to stay below the 500-gram figure,

2   and I think, again, based on the investigation that was

3   done, without taking into account anything from

4   Confidential Informant 3 or Confidential Informant 4,

5   the record establishes, at least during the life of this

6   conspiracy, Mr. Reyes -- it was reasonably foreseeable

7   to him that the quantity exceeded 500 grams.

8           So we would offer either of those methods as a

9   reasonable and, in the government's view, an extremely

10  conservative calculation of the drug weight in this

11  case.

12          While we discussed the leadership role, your

13  Honor, the government does not object to it, and in any

14  event, given Mr. Reyes's career offender status, it

15  doesn't affect the career offender calculation.

16          THE COURT:  Thank you.

17          MR. GARRITY:  Your Honor, with respect to the

18  first method of calculation, the government proposed

19  utilizing CI No. 2 in the controlled buys, and the

20  stipulated facts in the plea agreement that Mr. Reyes

21  was dealing with CI No. 2 for a period of six months, I

22  think I would agree with the government.  If there had

23  been any indication by CI No. 2 as laid out in the

24  stipulated facts in the plea agreement that we were

25  dealing in X amounts on an average basis during these

1    two to three times he would meet with Mr. Reyes, I would

2    submit it's pure speculation as to the amounts being

3    dealt with and the times for the controlled buys.

4    There's no indication at all that those sales were a

5    typical amount sold over the six months, no indication

6    that he was buying one gram as opposed to a quarter gram

7    or any type of figure.  So the government's asking you

8    to engage in pure speculation utilizing that method.

9            And with method number two, using the money

10   and the controlled buys, I think the First Circuit said

11   you can use the money.  You can use that to translate it

12   into a drug amount.  Nevertheless, it still doesn't get

13   them to 500.  It gets them to a little over 400, and,

14   again, they are asking you to engage in speculation that

15   there was dealing going on in these other time periods

16   and that it was in an amount that could get it over 500.

17   Absent putting forward these people saying here's what

18   we were doing, here's what we do on a typical sale over

19   X amount of weeks or months I would argue is pure

20   speculation in terms of whether or not Mr. Reyes was

21   engaged in dealing over 500 grams.

22           In some ways the government's methodology

23   makes some sense, but without a foundation with method

24   number one in terms of the amounts, it's a pure guess.

25   With methodology number two, it leaves them well short

1    and again asks you to engage in speculation in terms of

2    what he was doing on these other occasions prior to the

3    six months outlined by CI No. 2.  So we would object to

4    the 500 grams.

5             THE COURT:  The historical data has to be

6    treated cautiously, particularly when there isn't any

7    testimony before the Court as such.

8             The Court finds that the second method of

9    calculating quantity is more reliable because we have

10   hard facts, and if the Court takes that second method as

11   suggested by the government of the cash seized and then

12   gives a very conservative reliance on historical data,

13   the Court can find with confidence that the defendant is

14   responsible for at least 400 but less than 500.

15            That being the case, in paragraph 26 the base

16   offense level would be 24.  Is that correct?

17            MS. GAUVIN:  I'm going to check right now for

18   your Honor.

19            (Pause.)

20            MS. GAUVIN:  Your Honor is correct.  It would

21   be Offense Level 24 for at least 400 grams of cocaine

22   but less than 500 grams of cocaine.

23            THE COURT:  Right.  So paragraph 26 would be

24   changed from 26 to 24, and paragraph 31 would be changed

25   from 26 to 24.

1            And under the amendment to the plea agreement

2    which was filed today, because the Court has found the

3    defendant is liable for less than 500, the maximum term

4    of imprisonment would be 20 years, maximum fine of one

5    million, supervised release not less than three, not

6    more than one.

7            Anything else with respect to the report, Mr.

8    Garrity?

9            MR. GARRITY:  Yes, your Honor.  Again, it's I

10   guess not in the manner of an objection.  I was able to

11   finally get the drug certifications from Attorney Annino

12   that's led to a couple of continuances here.  I showed

13   those to the government, and I have the associated

14   police report with that.  The drug certification has a

15   name on it, Louis Aceudo, A-C-E-U-D-O, and it has an

16   amount of 619 glassine bags, and there's some associated

17   reports with it that have some additional amounts, 112

18   glassine bags on one report and it looks like there's

19   four or five drug certifications attached to it.  None

20   of them are Dookhan certifications.  The police report I

21   have has Mr. Reyes's name on it, an individual by the

22   name of Mr. Sanchez, an individual by the name of

23   Antonio Lopez, and then there's another name in here,

24   Acevedo, A-C-E-V-E-D-O.  Wasn't until Mr. Feith pointed

25   out that perhaps the Acevedo that's on the drug

1   certification may be Acevedo.  I thought there might be

2   some sort of connection.  When I got these reports from

3   Attorney Annino it looks like they may not have been

4   connected with that conviction.

5           And all of that is a long-winded argument for

6   perhaps leaving Mr. Reyes with the ability to file a

7   2255 if it turns out that the drug certifications I got

8   from Mr. Annino turn out not to be the correct drug

9   certifications.  And I think the government doesn't

10  object to this.

11          MR. FEITH:  I mean, your Honor, he has

12  whatever rights he has to file a 2255.  I understand and

13  I've discussed with Attorney Garrity that the Court --

14  and I had conversations with Deputy Clerk Lynch last

15  week along with a representative of the Federal

16  Defender's Office and Deputy Chief Battistelli as well

17  as Kevin Lavigne about a type of standing order that's

18  going to come out on the hidden laboratory cases.  Part

19  of that order addresses 2255 issues, whatever rights Mr.

20  Reyes has.  We're not seeking to abridge those in any

21  way.  I discussed with Mr. Garrity that this lab report

22  is not from the hidden lab, so unless there's some

23  expansion of the current allegations to other

24  facilities, but whatever rights he has, he has and we're

25  not seeking to abridge those in any way.

1          THE COURT:  Yes.  And if more information

2    becomes available in the future that indicates that

3    these underlying convictions, that there is a problem

4    with them, either they are going to be voided or

5    annulled or overturned or whatever, dismissed, then of

6    course he can come back and seek relief in terms of his

7    sentence, a 2255.

8          MR. GARRITY:  Thank you, your Honor.  One

9    other issue, Judge.  I discussed this with Ms. Gauvin.

10   It's in paragraph 40.  It's on page 11.

11         THE COURT:  Yes.

12         MR. GARRITY:  And there is reference there to

13   possession with intent to distribute Class A heroin and

14   I think in Docket No. 9802CR7200A, B, and C where,

15   again, there's reference to possession with the intent

16   to distribute.  And there's an associated sentence with

17   at least Count 1 and 2.  Attorney Lazar -- he was the

18   attorney that went into Roxbury District Court to try to

19   vacate those priors.  He filed his motion.  That motion

20   was not successful.  But the Court issued a decision in

21   denying the motion, and I showed this to Ms. Gauvin.

22         In footnote two, the Court indicated that

23   Docket No. 9802CR7200 was dismissed.  Maybe I misread

24   the PSR report, but it appears that 9802CR7200 was

25   dismissed in its entirety, and Mr. Reyes was convicted

1    only of distribution -- or possession with intent to

2    distribute cocaine.  And the police report associated

3    with that shows it was a small hand-to-hand distribution

4    of $40 worth of cocaine.

5            THE COURT:  You're talking about paragraph 40.

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  I don't understand anything you've

8    said.

9            MR. GARRITY:  There's talk about heroin in the

10   report, Judge, at paragraph 40.  But it appears that any

11   charge associated with that was dismissed and what Mr.

12   Reyes was convicted of was cocaine distribution and that

13   was --

14           THE COURT:  Well, talk about what's listed

15   here so that I know what you are talking about, because

16   I don't have the documents you're referring to.

17           MR. GARRITY:  Paragraph 45, Count 1 being

18   possession.

19           THE COURT:  Yes, possession Class A substance

20   Class A substance heroin with intent to distribute,

21   you're saying that was dismissed.  Is that right?

22           MR. GARRITY:  Yes, your Honor.

23           THE COURT:  Do you agree?

24           MS. GAUVIN:  Your Honor, if you look in the

25   narrative section under that, the docket number that

1   Attorney Garrity is talking about, 987200, was dismissed

2   and it was replaced with the docket that lists the

3   counts that are set forth in the report.

4             THE COURT:  Give me the bottom line.  Which of

5   these offenses is left?  That's all I care about.

6             MR. GARRITY:  He was convicted of Counts 1 and

7   2 in paragraph 40, possession of Class A substance

8   heroin and possession of Class B substance cocaine.

9             THE COURT:  The others are gone.

10            MS. GAUVIN:  Correct.  Counsel's referring to

11  a completely separate docket number, which I discussed

12  later, that charged the same offenses but was dismissed.

13            THE COURT:  So 1 and 2 are there, remain.

14  Three is gone.

15            MS. GAUVIN:  Yes, 3 and 4 were dismissed.

16            THE COURT:  Three and four were dismissed, all

17  right.

18            MR. GARRITY:  Judge, just so it's clear --

19            THE COURT:  That doesn't change the three

20  points, does it?

21            MS. GAUVIN:  No.  What Attorney Garrity is

22  referring to is that there was a case filed in that

23  court before the defendant pled guilty to those

24  offenses.  And my paperwork, my court records, say that

25  he was charged the same way.  The case was dismissed and

1   then they replaced it with the charges that he's been

2   convicted of.  He's alleging that they took away any

3   conviction of heroin, and that's not what my court

4   records say.

5              MR. GARRITY:  In effect, that's my argument,

6   Judge.  The heroin matters were dismissed.  He was

7   convicted --

8              THE COURT:  Not 1 and 2 though.  1 and 2,

9   possession of Class A heroin with intent to distribute.

10  Right?  Paragrah two, possession of Class B cocaine with

11  intent to distribute.  You say no?

12             MR. GARRITY:  I say no, Judge, and I say that

13  based on the charging document that's associated with

14  the sentence he got 18 months, which was on and after

15  six months for a prior matter that he was on probation

16  for, and the documents from Roxbury District Court bear

17  that out.  There was only one count that he was

18  convicted of and that was on February 8th of 1999.

19             I'm not arguing that that doesn't constitute a

20  predicate, but I think the facts associated with a

21  predicate are irrelevant for a variance argument if one

22  count was cocaine Class B and that was 18 months house

23  of corrections from and after a prior matter that he was

24  on probation for where he got six months.  So my

25  argument is that the heroin matter was dismissed in its

1    entirety as is reflected in the order issued by the

2    Court out of Roxbury District Court associated with

3    Attorney Lazar's motion.

4         THE COURT:  I don't know because I don't have

5    that record before me.  Do you know what he's talking

6    about?

7         MR. FEITH:  Today's the first I've heard of

8    it, your Honor, so I don't know.  As I understood it, I

9    understood it the same way Probation Officer Gauvin did,

10   which is the documents that Attorney Garrity has refer

11   to what is the original docket number which in fact was

12   dismissed, but it's replaced with the docket number that

13   the court sees in paragraph 40, 9902CR738A, B, C, D, and

14   the disposition of those charges is as set forth in

15   paragraph 40.

16        MR. GARRITY:  Your Honor, may I approach?

17        THE COURT:  I will take a recess to look over

18   these documents.

19        MR. GARRITY:  Judge, the first one, those are

20   the documents from the Roxbury District Court.

21        THE COURT:  This really all should have been

22   brought out in the memorandum ahead of time.

23        (Brief recess taken.)

24        THE COURT:  All right.  I looked through the

25   memorandum decision from the Massachusetts court that

1    you provided and the records and it's clear that 7200

2    was dismissed.  A new complaint was filed.  That was

3    738, and that's reflected in paragraph 40, paragraphs 1,

4    2, 3, and 4, and the defendant pled guilty to 1 and 2,

5    and 3 and 4 were dismissed.  So that's the situation.

6              And, by the way, it's clear, Ms. Gauvin showed

7    me the records, that paragraph one related to heroin and

8    paragraph two related to cocaine.

9              MR. GARRITY:  And Ms. Gauvin showed those

10   records to me.  I didn't have those.

11             THE COURT:  Okay.  So I'm returning those

12   documents to you that you provided.

13             MR. GARRITY:  Thank you.

14             THE COURT:  All right.  Anything else?

15             MR. GARRITY:  No, your Honor.

16             THE COURT:  Then the Court accepts the factual

17   findings in the Presentence Investigation Report with

18   the exception of quantity which the Court has made an

19   independent determination on, and the Court has also

20   noted changes in the offense level computation as

21   previously noted on the record.

22             MS. GAUVIN:  Excuse me, your Honor.  And the

23   Court also did not find an aggravating role, so that two

24   levels will also be taken off the report.

25             THE COURT:  Yes.  I already did that.  Yes.  I

1    believe I did.  I referred to paragraph 26.  That is now

2    24 and paragraph 31 is now 24.

3            So the total offense level because of the

4    career offender status is 30, a criminal history

5    category of VI.  That yields a guideline range of 168 to

6    210 months.  Do you agree?

7            MR. FEITH:  Yes, your Honor.

8            MR. GARRITY:  Judge, there's one further issue

9    in terms of whether he was entitled to the third level

10   for acceptance.  I think we addressed this in the

11   September hearing, that it was our position that

12   contractually under the plea agreement the government

13   was obligated to follow through with the third level.

14   That's our position, Judge.

15           THE COURT:  All right.

16           MR. FEITH:  Your Honor, I think the plea

17   agreement contains the standard language as to

18   acceptance of responsibility and does not contractually

19   bind the United States to that third level.  It is

20   conditional on the defendant having assisted in the

21   investigation or prosecution of the defendant's own

22   misconduct by timely notifying the United States of the

23   intention to enter a plea, and as I recall the record,

24   this plea was done within a few days of jury selection

25   after an exhibit list had been filed by the United

1   States, and that doesn't fall under the timely

2   notification provisions.  The PSR report of a two-level

3   adjustment for acceptance is correct in the government's

4   view.

5          MR. GARRITY:  Judge, it would be our position

6   that given the language of the plea agreement along with

7   the stipulated cap for sentencing, 151, it would not

8   make sense given the 151 cap that the government would

9   be taking a contrary position that he doesn't get the

10  third level.  At the time he entered the plea, I think

11  everyone was of the understanding that he was going to

12  get the third level, and the 151 only makes sense in

13  that context.  So we would argue that the government is

14  contractually bound to move for the third level, third

15  point.

16         MR. FEITH:  Well, your Honor, I mean, I

17  understand that this plea agreement was put together

18  sort of in a rush, at least that's my understanding from

19  reviewing the file, but the language just doesn't do

20  what Attorney Garrity says it does.  The 151 number

21  frankly, your Honor, is really from whole cloth if you

22  look at the factual situation at the time of the plea.

23  Mr. Reyes's exposure based on the 851s that were filed

24  at the time, and I understand the Court's ruling on

25  that, was much, much higher than 151.  So whatever the

1   reasoning was as to the 151 -- and the United States is

2   going to abide by that number, your Honor.  We're going

3   to argue for that number.  I don't think the record

4   pinpoints it to an acceptance decision.  There was much

5   more going on in this case at that time, and indeed as

6   reflected in the first PSR, the weights that at that

7   time the United States was advocating and provided

8   information to probation established penalties far

9   exceeding the 151 number.

10          So I just -- I don't think the record can be

11  read fairly to say that that was a determinative factor

12  for the 151.  Frankly because I wasn't -- it wasn't

13  submitted for approval, I can't tell the Court how the

14  151 number was contrived.  What I can tell the Court is

15  that there were many, many more things going on, I think

16  as the Court is well aware.

17          THE COURT:  All right.  Thank you.  The Court

18  will stand by its original decision to only allocate the

19  two levels for acceptance of responsibility, and as I

20  stated previously, that results in a total offense level

21  of 30, criminal history category of VI, a guideline

22  range of 168 to 210.  Does the government have a

23  recommendation?

24          MR. FEITH:  It does, your Honor.  For the

25  reasons stated in its sentencing memorandum, the United

1    States asks the Court to impose a sentence of

2    151 months.  I think the driving argument behind the

3    United States's recommendation is Mr. Reyes's

4    recidivism.  He was given sort of incremental

5    punishment.  His record of incarceration starts fairly

6    low at six months.  Then there's an 18-month sentence,

7    resulting in 24 months of incarceration, and then

8    there's a five-year sentence, and almost immediately

9    upon his release -- and I think this is corroborated by

10   the information at paragraph 58 of the PSR saying that

11   upon his release he didn't have any legitimate

12   employment.  He resorted to drug dealing to support --

13   or he intimated to probation that he was only drug

14   dealing to support himself and his habit.

15          So he clearly, even after a 60-year -- which

16   is an appreciable amount of time to spend

17   incarcerated -- returned to a -- not 60 years, excuse

18   me, 60-month sentence -- returned to criminal activity.

19   So the driving force behind the government's

20   recommendation is that he will not be deterred, your

21   Honor.  It's the United States' view that no matter what

22   number the Court gives him he will not be deterred, but

23   the public needs to be protected because there is a

24   pattern here of returning to criminal conduct and

25   specifically drug dealing.

1          THE COURT:  Thank you.  Mr. Garrity?

2          MR. GARRITY:  Your Honor, as our sentencing

3    memo asks for, we are arguing that an 84-month sentence

4    is a reasonable and appropriate sentence in this case,

5    and I say that for a couple of reasons.  One, as the PSR

6    outlines, Mr. Reyes's upbringing was awful, and I'd

7    argue outside the range of even a lot of defendants who

8    come before this Court who I say to a great extent do

9    have awful upbringings.

10          But his was particularly bad in that his

11   parents were addicts themselves, and then they

12   prostituted Mr. Reyes at an extremely young age to feed

13   their own addictions.  From 11 to 15 he was prostituted

14   on the streets of Puerto Rico.  He then left his family

15   home when he was 15.  He himself became an addict to a

16   number of substances.  As the PSR indicates, he's been

17   an addict since then.  But given the role models he had

18   as parents who were so bad they were willing to

19   prostitute him, it's not all that surprising.  It

20   doesn't explain away what he did in his later years, but

21   it places in context this is not someone who came from a

22   great upbringing and all of a sudden turns to drug

23   dealing.

24          A lot of these drug deals that he engaged in

25   were to feed his own addiction.  I think he had one

1   short-lived drug treatment.  I think it was a couple

2   weeks in 1998, but he's never had substantial drug

3   treatment, even when he was incarcerated for five years

4   in Massachusetts.

5           And I understand that the public has to be

6   protected.  I think if you look at his record without

7   knowing his upbringing, maybe it makes sense to send him

8   away for a long time, but I think given his upbringing

9   it shows that the sentence the government's argued for

10  is way over the top, especially even how he's conducted

11  himself while he's been incarcerated at Strafford

12  County.

13          For the first time in his life I think he's

14  taken meaningful steps to get his life, even given his

15  age, on the right track.  He's obtained his GED.  He's a

16  trustee at the jail.  He has no disciplinary problems at

17  the jail.  He's completed the life skills course,

18  computing course, drug and alcohol program at the house

19  of corrections.  They don't offer much, but he's engaged

20  in every program they have over there as a way to better

21  himself.  And the GED is I think a huge step for Jose

22  given his educational background and his lack of

23  employment and lack of employment skills that along with

24  his addiction led him to being engaged in this sort of

25  activity.

1          And if you look at the sentences his

2   co-defendants got, who the government appears to agree

3   were equal co-workers, one gets 49 days and one gets

4   70 days?  I'm not going to stand before you and say that

5   they have the same sort of background that Mr. Reyes

6   has.  They don't have the same sort of record most

7   likely that Mr. Reyes has, and he certainly should be

8   punished because of his prior record, but that extent of

9   a disparity given that they were fully engaged in the

10   same sort of activity?

11          And it's my understanding that those two

12   people at least were looked at by the U.S. Attorney's

13   Office up here and they deferred prosecution to the

14   state courts.  So it's not as if the government wasn't

15   aware of them, and they get those sentences and they

16   want to send Mr. Reyes away for 151 months?  I think

17   there has to be some -- at least some relative

18   similarity in sentencing given the sort of conduct they

19   were all engaged in.  Certainly he warrants more given

20   his record, but not to the extent the government's

21   asking for.

22          And, Judge, he is a relatively older man.

23   He's now in his early to mid-fifties.  He's got a number

24   of health problems.  Even under a sentence we're

25   proposing he's going to be close to 60 years old when

1  he's released.  I think the statistics are pretty clear

2  that at that age recidivism rates drop substantially.  I

3  know his record may not bear that out, but I think the

4  steps he's taken at the jail to better himself along

5  with those statistics of a lower recidivism rate

6  indicate that the sentence we're asking for is more than

7  reasonable.  It's a lengthy period of incarceration.

8  It's not a slap on the wrist.  It takes into account

9  what his co-defendants got to some extent, takes into

10  account his prior record, takes into account his

11  upbringing and his background, takes into account his

12  addiction.  And I think the 500-hour drug program, if

13  recommended, would also deal with that as well, could

14  help Jose to stay on the right track when he gets out.

15  But 151-month sentence, Judge, I think is unreasonable.

16  And I know he has these prior convictions.  They're

17  relatively old.  They are for relatively small amounts,

18  not massive amounts.

19          There's no guns involved with Mr. Reyes.  I

20  don't think any of the reports I've seen indicate that

21  he's ever possessed a weapon, ever engaged in violence

22  during these drug activities.  So he's not I think in

23  the high end category of drug dealing which warrants a

24  career offender type of sentence, especially given his

25  background and especially given what he's done to try to

1    better himself.

2          So we would ask for the 84-month sentence

3    along with a recommendation of the 500-hour drug

4    program.  And, your Honor, I think Mr. Reyes would like

5    to address the Court.

6          THE COURT:  Yes.  Mr. Reyes?

7          MR. GARRITY:  Judge, one further thing, the

8    letter he wrote to the Court that's attached to the PSR

9    I think speaks, I guess, eloquently about how Mr. Reyes

10   views his conduct and how he's finally realized that

11   what he did was wrong and now he wants to get on the

12   right track, but he would like to address the Court.

13         THE COURT:  Yes, of course.  Mr. Reyes.

14         THE DEFENDANT:  I'd like you to read this

15   letter to the judge.  Your Honor, first I would like to

16   say that I'm sincerely sorry for the actions that my

17   drug use has caused.  I hope that this honorable court

18   understands that I've been a drug addict for many years

19   and really want help stopping my use.  Since I've been

20   sober I can see all that I was doing wrong and are able

21   to feel regret.  When I was under the influence of drugs

22   I could not properly feel or see clearly to make good

23   decisions.  This has equaled me making bad decisions for

24   most of my life.  Sure, it is easy to say you should

25   have thought about that sooner, but it's not like that

1   for a drug addict.  Unless someone intervenes on your

2   behalf or you get arrested, you will most likely die

3   knowing that you need help but never thinking clear

4   enough to get it.  I'm begging the mercy of this

5   honorable court with hopes that I may receive leniency.

6   I understand what I did and know there must be

7   consequences for this.  But please understand that I did

8   what I did to support my habit and not out of criminal

9   intent.  I am old, sick, and alone in this world.  I

10   have no family or friends to help support me, and that

11   means this honorable court is all I have to rely on for

12   help.  Even though I am in the career criminal category,

13   please do not throw away the rest of my life in prison

14   without ever having gotten the chance to get help.  I've

15   been going to school and attending rehabilitative

16   classes since I've been incarcerated, learning about the

17   drug and how to overcome my addiction.  I believe that

18   given the chance I can be rehabilitated and be a

19   productive member of society.  In conclusion, I beg the

20   mercy of this honorable court and ask that you see that

21   I need help, and if it be within the power of this

22   honorable court to grant such, please help me.  I

23   sincerely apologize for the crimes that I've committed

24   against the people of the United States, the government,

25   and this honorable court.  Thank you.

1               THE COURT:  Thank you.

2               MR. GARRITY:  Your Honor, I apologize, one

3    further thing and I overlooked this.  Mr. Reyes after

4    his plea did attempt to cooperate with the government.

5    He provided a proffer to the government in early July,

6    and I know Mr. Feith has not or will not file a 5K1

7    motion, but it is an issue I think that the First

8    Circuit has said the Court can take into account when

9    dealing with a variance argument.

10              At the time the government at least implied

11   that there would be a 5K1 motion.  Mr. Feith I

12   understand has taken the position that they will not

13   file one.

14              THE COURT:  He made a proffer with whom, do

15   you know?

16              MR. GARRITY:  Yes, with Ms. Ollila and

17   Detective Brian LaValley.  And that was on July 9th of

18   this year.

19              I can represent to the Court it was not going

20   to be a huge 5K1, but there was an implied promise that

21   there was going to be a 5K1.  I think the First Circuit

22   has recently addressed this issue in --

23              THE COURT:  Yes, I remember reading that case.

24              MR. GARRITY:  Thank you, your Honor.

25              (Pause.)

1           THE COURT:  Please stand, Mr. Reyes.  The

2    Court will read the sentence, and if either counsel has

3    a legal objection, you can tell me what that is when I

4    finish.

5           Pursuant to the Sentencing Reform Act of 1984,

6    it is the judgment of the Court that the defendant, Jose

7    Reyes, is hereby committed to the custody of the Bureau

8    of Prisons to be imprisoned for a term of 120 months.

9    This term consists of 120 months on each of Counts 1

10   through 4, all such terms to be served concurrently.

11          It is recommended to the Bureau of Prisons

12   that the defendant participate in the Intensive Drug

13   Education and Treatment Program.

14          Upon release from imprisonment the defendant

15   shall be placed on supervised release for a term of four

16   years.  This term consists of four years on Count 1 and

17   three years on each of Counts 2, 3, and 4, all such

18   terms to run concurrently.

19          Within 72 hours of release from the custody of

20   the Bureau of Prisons, the defendant shall report in

21   person to the probation office in the district to which

22   he is released.  While on supervised release the

23   defendant shall not commit another federal, state, or

24   local crime, shall comply with the standard conditions

25   that have been adopted by this Court, and shall comply

1   with the following additional conditions:

2            One, he shall not illegally possess a

3   controlled substance.

4            Two, he shall not possess a firearm,

5   destructive device, or any other dangerous weapon.

6            Three, pursuant to law he shall submit to DNA

7   collection while incarcerated in the Bureau of Prisons

8   or at the direction of the probation office.

9            Four, he shall refrain from any unlawful use

10  of a controlled substance.  He shall submit to one drug

11  test within 15 days of placement on probation and at

12  least two periodic drug tests thereafter, not to exceed

13  72 drug tests per year of supervision.

14           Five, the defendant shall pay any financial

15  penalty that is imposed by this judgment and that

16  remains unpaid at the commencement of the term of

17  supervised release.

18           In addition, the defendant shall comply with

19  the following special conditions:

20           One, as directed by the probation officer, he

21  shall participate in a program approved by the United

22  States Probation Office for treatment of narcotic

23  addiction or drug or alcohol dependency which will

24  include testing for the detection of substance use or

25  abuse.  He shall also abstain from the use of alcoholic

1    beverages and/or all other intoxicants during and after

2    the course of treatment.  He shall pay for the cost of

3    treatment to the extent he is able as determined by the

4    probation officer.

5              Two, he shall submit his person, residence,

6    office, or vehicle to a search conducted by a U.S.

7    probation officer at a reasonable time and in a

8    reasonable manner based upon reasonable suspicion that

9    contraband or evidence of a violation of a condition of

10   release may exist.  Failure to submit to a search may be

11   grounds for revocation.  The defendant shall warn any

12   other residents that the premises may be subject to

13   searches pursuant to this condition.

14             The defendant is ordered to pay a special

15   assessment of $400 which shall be due in full

16   immediately.  The Court finds that the defendant does

17   not have the ability to pay a fine and waives the fine

18   in this case.

19             The defendant is remanded to the custody of

20   the United States Marshal.

21             Does the government have any legal objection

22   to the sentence?

23             MR. FEITH:  It does not, your Honor.  Thank

24   you.

25             THE COURT:  Any legal objection?

1          MR. GARRITY:  No, your Honor.

2          THE COURT:  It's my obligation to inform you,

3     Mr. Reyes, that to the extent that there are any issues

4     that can be appealed, you do have the right to appeal

5     this sentence to the First Circuit Court of Appeals in

6     Boston.  That appeal must be taken within 14 days of

7     when judgment is entered, and if you cannot afford the

8     costs of an appeal or an attorney on appeal, then those

9     will be provided for you.

10          In imposing this sentence the Court has

11    weighed and considered the sentencing range under the

12    advisory guidelines, the policies underlying those

13    guidelines, and all of the various sentencing factors

14    set forth in Section 3553(a), and in particular, the

15    Court has imposed this sentence for the following

16    reasons.

17          Number one, the Court has considered the

18    government's recommendation of 151 months and the

19    defendant's recommendation of 84 months.  The Court has

20    also considered the stipulation entered into by the

21    government and the defendant pursuant to Federal Rule of

22    Criminal Procedure 11(c)(1)(C) that the defendant not be

23    sentenced to a term of imprisonment greater than

24    151 months.  The Court has accepted this binding

25    stipulation.

1           Two, a conspiracy to distribute cocaine and

2    the distribution of cocaine are serious offenses due to

3    the very addictive nature of the drug and in this

4    instance given the amounts involved.  Therefore a

5    sentence of imprisonment of appropriate length is

6    necessary to punish the defendant for these offenses, to

7    deter him and others from committing similar offenses,

8    and to promote respect for the law.

9           Three, the defendant has a criminal history

10   category of VI and also qualifies as a career offender.

11   He has a history of drug trafficking.  The Court

12   considers him to be a high risk for recidivism.

13          Four, the defendant has a protracted problem

14   with substance abuse and has had a minimal employment

15   history, and he had a very difficult upbringing and

16   currently has health problems.  He has obtained a GED

17   while incarcerated and participated in AA meetings.  He

18   also made a proffer with the government in July of 2012.

19          Five, the sentence imposed is sufficient but

20   not more than necessary to punish the defendant for

21   these offenses, to deter him and others from committing

22   similar offenses, to promote respect for the law, to

23   protect society, and to take into account the

24   defendant's individual characteristics.

25          Court will be in recess.

1                    (Adjourned at 3:35 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                      C E R T I F I C A T E

3

4              I, Diane M. Churas, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9    Submitted: 5/20/13

10                              **DIANE M. CHURAS, LCR, RPR, CRR**
                                LICENSED COURT REPORTER, NO. 16
11                              STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25